IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| STATE OF WASHINGTON, | ) | No. 73363-0-I |
|---|---|---|
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| OTIS BRYANT, JR, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 26, 2016 |

SCHINDLER, J. — A jury convicted Otis Bryant Jr. of arson in the first degree - domestic violence. Bryant contends improper opinion testimony violated his constitutional right to a fair trial. Bryant also objects to the imposition of appellate costs. We affirm the conviction and waive imposition of appellate costs.

Creston Point Apartments (Creston Point) is a large multi-building apartment complex in Seattle. In August 2014, Monica Bissell lived in building B of Creston Point.

On August 21, King County Deputy Jaron Smith responded to a reported dispute between Bissell and Otis Bryant Jr.

On August 29, Bissel called the police for help to remove Bryant from her apartment. Deputy Smith found Bryant asleep in Bissel's apartment. Bryant was "quite intoxicated" and "very difficult to wake up." Deputy Smith told Bryant that Bissel "did not want him here" and escorted him out of the apartment.

At approximately midnight on August 29, a Creston Point security officer called 911 for help in removing Bryant from outside Bissell's apartment. King County Sherriff's Office Deputy Robert Nishimura and Deputy Devon Stratton responded.

The deputies found Bryant in a stairwell of Bissell's apartment building. Deputy Nishimura asked Bryant whether he "had another place he could stay." Bryant told Deputy Nishimura he was "staying with a friend" in building K of the apartment complex. But Bryant did not know the name of his friend or the unit number of the apartment and did not have a key. On the way to building K, Bryant pointed out his black 1985 four-door Toyota Corolla to Deputy Nishimura.

Alexander Uth arrived at the Creston Point complex around 2:00 a.m. on August 30. As Uth parked his car, he saw a black male near a dark-colored compact car with all four doors and the trunk open. Uth heard the man saying "something about being rufied"[1] and "he would get revenge on a girl." The man said, " 'On my mama's grave, I am going to get back at this bitch.' "

At approximately 2:40 a.m., Creston Point Security Officer Chad Mathis noticed Bryant sitting in his car. The car was parked "kitty corner to the B building." Mathis saw Bryant remove a backpack from the trunk of the car and walk toward building B.

At approximately 3:20 a.m., the Renton Fire Department responded to a fire alarm at Creston Point. Firefighters saw smoke coming from building B. The smoke was "billowing out" of Bissell's apartment. Firefighters were able to extinguish the fire "on the couch" and "around the door."

---

[1] Also known as a "roofie" or Rohypnol, an illegal benzodiazepine sedative drug.

2

Arson investigator Gerard Kenny investigated and examined the apartment. Kenny concluded "somebody poured gasoline underneath the door" of Bissell's apartment, poured a trail of gasoline away from the door, and then ignited the gasoline.

At some point during the arson investigation, Bryant approached Kenny. Bryant was "very upset" with Bissell. Bryant told Kenny that Bissell made him "a couple of drinks" and "put some rufies in there." Bryant agreed to give a recorded statement.

In the recorded statement, Bryant said Bissell "put me out" and "stole my money and . . . my drugs . . . out of my pocket." Even though Kenny did not mention that the fire had been stared with gasoline, Bryant denied starting the fire with gasoline.

KENNY:      Do you know what happened here?

[BRYANT]:   No.

KENNY:      OK.

[BRYANT]:   I honestly, don't.

KENNY:      OK.

[BRYANT]:   The only thing that, one, one guy told me, said that a door is on fire.

KENNY:      And here is the problem I have is that you were here at midnight and you know the cops were here at midnight.

[BRYANT]:   Yeah, but they escorted me to the front door.

KENNY:      Right. But do you understand what I'm getting at?

[BRYANT]:   Hm, thing about it —. When, when we walked back down here, uh, Chad [Mathis] gave me my keys and I walked back to the house, well no they took me back to the house and I stayed inside.

KENNY:      But do you understand what I'm trying to get at.

[BRYANT]:   Uh, no.

3

KENNY:        People are looking at you for doing this fire —

[BRYANT]:      I ain't, I ain't do no shit like that. This thing about, this thing about people, when people think that you say if am I do somethin' I'm gonna go all the way, um, um, I'm gonna lay it, um, do everything I can to hurt everybody 'cause I've been hurt. But other than that I never do dumb shit like that. Ah, I ain't, ah, uh, I don't have gasoline to put, put out and the dude say, he says smell like gasoline.

KENNY:        Which dude?

[BRYANT]:      Um, I really don't know man.

Washington State Patrol Crime Laboratory forensic testing showed gasoline residue on a doormat just outside the apartment, in a splinter of wood from the apartment door, and in fire debris from inside the apartment.

The State charged Bryant with arson in the first degree in violation of RCW 9A.48.020(1)(b).[2] The State alleged the crime constituted domestic violence under RCW 10.99.020.

Deputy Nishimura testified during the pretrial CrR 3.5 hearing on whether to admit Bryant's statements. Deputy Nishimura said that when he tried to find out where Bryant was living, Bryant "pulled a bunch of stall tactics on us to pretty much prevent us from verifying that." The court ruled Bryant's statements were admissible.

Following the CrR 3.5 hearing, defense counsel made a motion to preclude Deputy Nishimura from testifying about "his opinion that Mr. Bryant was stalling or attempting to prevent verification of his address."

> Deputy Nishimura made some mention of his opinion that Mr. Bryant was stalling or attempting to prevent verification of his address.

---

[2] The State also charged Bryant with assault in the fourth degree domestic violence for the dispute on August 21 but later dismissed the charge.

4

I don't mind the officer testifying as to everything that he saw Mr. Bryant say and do. My issue is with the interpretation he attaches to that, the opinion.

The court ruled Deputy Nishimura cannot "offer his opinion" but could "describe what [Bryant's] behavior and actions were."

Well, okay, I don't think he — I don't think the officer can offer his opinion.
. . . .
Now you can describe what [Bryant's] behavior and actions were, and the jury very well may come to that conclusion that he was stalling and that counsel was clearly able to argue yes, he was stalling — no, he wasn't stalling — you know, that kind of thing, but I don't think the witness can offer an opinion as to whether it is — he was stalling.
So but certainly you are free to ask him a whole bunch of questions, which would arguably make it very clear that he was stalling, but you know there's a bunch of ways you could do that without getting the officer to render his ultimate opinion about "he was stalling," which I think is an opinion.

The State called a number of witnesses to testify at trial including Bissell, Uth, Mathis, Kenny, Deputy Smith, and Deputy Nishimura.

Without objection, Deputy Nishimura testified that when he asked Bryant "whether he had another place to stay," Bryant "wanted to go move his car" rather than going directly to building K. Deputy Nishimura told Bryant that "we wanted him to go show us where he lived." Deputy Nishimura testified Bryant said he "didn't know the name of the person he was living with," "didn't have a key for the building," and "didn't know the unit." Deputy Nishimura said he "was just being difficult." The defense objected to the testimony that Bryant was "just being difficult."

Q. Did [Bryant] tell you the name of the person he was staying with?
A. No.
We asked him. He couldn't tell me the name.
Q. Okay.
Did you go directly from [Bissell]'s building to the K building?
A. No, he wanted to go move his car.

5

His car was by the — I want to say the D building and we told him that we wanted him to go show us where he lived, and he told us he didn't have a key for the building, and that he didn't know the name of the person he was living with. And then he didn't know the unit. And he was just being difficult, so we finally get to the apartment and —

[DEFENSE COUNSEL]: Objection. Opinion — "being difficult"?

The court overruled the objection.

The jury found Bryant guilty of arson in the first degree. By special verdict, the jury found Bryant and Bissell were "members of the same family or household prior to or at the time the crime was committed."

Bryant seeks reversal arguing improper opinion testimony on his guilt violated his constitutional right to a fair trial.[3] We disagree.

As a general rule, no witness may offer testimony in the form of an opinion about the guilt of the defendant. State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014); State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury.

Quaale, 182 Wn.2d at 199.

We review the decision to admit alleged opinion testimony for abuse of discretion. Quaale 182 Wn.2d at 196; State v. Demery, 144 Wn.2d 753, 758, 30 P.3d

_____

[3] Bryant also challenges the failure to enter written CrR 3.5 findings of fact and conclusions of law. The trial court may enter findings and conclusions while an appeal is pending. State v. Howerton, 187 Wn. App. 357, 376, 348 P.3d 781 (2015). Here, the court entered findings and conclusions after Bryant filed his opening brief on appeal. Bryant does not contend he was prejudiced by the delay or the findings and conclusions were tailored to meet the issues presented on appeal. State v. Quincy, 122 Wn. App. 395, 398, 95 P.3d 353 (2004) (where trial court enters findings and conclusions after defendant submits opening brief on appeal, appellate court will not reverse unless defendant "can establish that he was prejudiced by the delay or that the findings and conclusions were tailored to meet the issues presented in his brief").

1278 (2001). " 'Where reasonable persons could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion.' " Quaale, 182 Wn.2d at 196 (quoting Demery, 144 Wn.2d at 758). The trial court abuses its discretion only when its decision is " 'manifestly unreasonable or based on untenable grounds or reasons.' " Quaale, 182 Wn.2d at 197 (quoting State v. Neal, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001)).[4]

We do not take an " 'expansive view of claims that testimony constitutes an opinion on guilt.' " Demery, 144 Wn.2d at 760 (quoting City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)). In determining whether statements constitute impermissible opinion testimony, the court will consider the circumstances of the case including: "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact." Quaale, 182 Wn.2d at 199-200. Testimony based on inferences from the evidence does not generally constitute an opinion on guilt.

> [T]estimony that is based on inferences from the evidence, does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury, does not generally constitute an opinion on guilt.

State v. Rafay, 168 Wn. App. 734, 806, 285 P.3d 83 (2012); State v. Blake, 172 Wn. App. 515, 528, 298 P.3d 769 (2012); State v. Notaro, 161 Wn. App. 654, 662, 255 P.3d 774 (2011). "The point is to avoid having witnesses tell the jury what result to reach." State v. King, 135 Wn. App. 662, 673, 145 P.3d 1224 (2006).

---

[4] We note the original quote in Neal states based "upon" untenable grounds or reasons. Neal, 144 Wn.2d at 609.

7

Here, Deputy Nishimura's remark that Bryant was "just being difficult" cannot reasonably be construed as a direct comment on Bryant's guilt. Unlike in Quaale, the testimony that Bryant was "being difficult" was unrelated to the core and disputed issue of whether Bryant committed arson. In Quaale, a Washington State Patrol Trooper testified that based on the horizontal gaze nystagmus (HGN) test alone, he had " 'no doubt [the defendant] was impaired.' " Quaale, 182 Wn.2d at 194-95. The Supreme Court held the testimony was an improper opinion on guilt "because the trooper's opinion went to the core issue and the only disputed element: whether [the defendant] drove while under the influence of alcohol." Quaale, 182 Wn.2d at 200.

The trial court did not abuse its discretion in overruling the objection to the testimony that when the deputies were trying to determine where Bryant lived, he was "just being difficult."

Further, any error was harmless beyond a reasonable doubt. "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). In light of the overwhelming untainted evidence that Bryant was guilty of the charged crime of arson in the first degree, the testimony of Deputy Nishimura was harmless beyond a reasonable doubt.

Bryant requests the court exercise its discretion to waive appellate costs. Under the nonexclusive factors in State v. Sinclair, 192 Wn. App. 380, 391, 367 P.3d 612 (2016), we waive the imposition of appellate costs.

We affirm Bryant's conviction but waive the imposition of appellate costs.

_Leishell, J._

WE CONCUR:

_Trickey, ACJ_          _Spearman, J._